## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Megan Marie Halsne, individually and as parent and natural guardian of J.J.H., <br><br> Plaintiff, <br><br> v. <br><br> Avera Health and Avera McKennan, <br><br> Defendants. | Case No. 12-cv-2409 (SRN/JJG) <br><br><br> **MEMORANDUM OPINION AND ORDER** |

Kenneth M. Suggs, Janet Jenner & Suggs LLC, 500 Taylor Street, Suite 301, Columbia, South Carolina 29201; Patrick Andrew Thronson, Stephen C. Offutt, and William Francis Burnham, Janet Jenner & Suggs LLC, 1777 Reisterstown Road, Suite 165, Baltimore, Maryland 21208, for Plaintiff.

Cecilie M. Loidolt, Mark R. Whitmore, and Sarah M. Hoffman, Bassford Remele, PA, 33 South Sixth Street, Suite 3800, Minneapolis, Minnesota 55402, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

Plaintiff Megan Halsne, individually and as parent and natural guardian of J.J.H., brings this medical malpractice action against Defendants Avera Health and Avera McKennan, asserting claims of medical negligence and loss of consortium. (Am. Compl. ¶¶ 23-28, 29-31 [Doc. No. 28].)

Defendants move for partial summary judgment on six grounds: (1) dismissal of all claims of negligent training; (2) dismissal of medical malpractice and employment claims

1

based on vicarious liability for the nurses at Pipestone County Medical Center; (3) dismissal of the medical malpractice claim against Defendants based on direct liability; (4) dismissal of negligent supervision claims against Defendants; (5) dismissal of Avera Health; and (6) limiting J.J.H.'s future medical expense damages to projected payments of premiums and deductibles under the Patient Protection and Affordable Care Act.  (Defs.' Mot. for Partial Summ. J. at 1-2 [Doc. No. 58].)

The parties agree that this case will proceed to trial on Plaintiff's medical malpractice claim against Avera McKennan based on the alleged actions of Dr. Michael Lastine and/or Brad Burris.  (Defs.' Mem. in Supp. of their Mot. for Partial Summ. J. at 2 [Doc. No. 60].) At oral argument and in her brief, Plaintiff confirmed that she has withdrawn the negligent training claims against Defendants, as well as the claims against Defendants based on vicarious liability for the nursing staff at Pipestone County Medical Center.  (Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. at 3 [Doc. No. 69].)  Thus, the first two grounds for Defendants' motion for partial summary judgment are moot.  For the reasons that follow, and with respect to the remaining four claims, the Court grants in part and denies in part Defendants' motion.

## II.   BACKGROUND

### A.  The Parties and Related Non-Parties to this Lawsuit

Ms. Halsne is the parent and natural guardian of her son, J.J.H., and both are residents of Minnesota.  (Am. Compl. ¶ 1 [Doc. No. 28].)  Defendants Avera Health and Avera McKennan are South Dakota corporations.  (Answer to Am. Compl. ¶ 3 [Doc. No. 31].)  Avera Health provides support services for hospitals, long-term care facilities, clinics,

and other shared service areas.  (Partners in Health Agreement, Ex. G to Aff. of Cecilie M.

Loidolt in Supp. of Avera Health's Mot. to Compel Joinder [Doc. No. 19-7 at 6].)  Avera

McKennan owns and operates an acute care hospital in Sioux Falls, South Dakota, and it is

capable of providing certain hospital management services.  (Id.)  Non-party Pipestone

County Medical Center ("PCMC") is a Minnesota corporation.  (Answer to Am. Compl. ¶ 4

[Doc. No. 31].)  PCMC is a hospital organized and operated by the County of Pipestone,

Minnesota.  (Jan. 30, 2002, Letter from James E. O'Neill, County Att'y, to Jody Jenner,

PCMC Administrator, Ex. H to Loidolt Aff. [Doc. No. 19-8 at 3].)  A five-member county

commission governs PCMC.  (Dep. of Bradley Burris at 9, Ex. A to Aff. of Melissa Riethof

in Supp. of Partial Summ. J. [Doc. No. 61-1].)

On June 1, 2007, PCMC, Avera Health, and Avera McKennan entered into a

Partners in Health Agreement ("Agreement"), under which Avera McKennan contracted to

provide hospital management services to PCMC in the form of an administrator.  (Partners

in Health Agreement ¶ 1, Ex. G to Loidolt Aff. [Doc. No. 19-7 at 6].)  The administrator,

Bradley Burris, is an employee of Avera McKennan, who reports to the PCMC Board of

Directors and receives direction from the Board.  (Id.; Burris Dep. at 8, Ex. A to Riethof

Aff. [Doc. No. 61-1].)  Although Avera McKennan can recommend policies and procedures

for PCMC to implement, the final decision-making authority to implement them rests with

PCMC.  (Dep. of Curt Hohman at 10-11, Ex. B to Aff. of Cecilie M. Loidolt in Supp. of

Defs.' Opp'n to Mot. to Compel [Doc. No. 56-2].)  The Agreement confirms that the

ownership and governance of PCMC remain with PCMC.  (Partners in Health Agreement ¶

5, Ex. G to Loidolt Aff. [Doc. No. 19-7 at 6].)

Dr. Michael Lastine, Ms. Halsne's obstetrician and gynecologist, is an employee of Avera McKennan.  (Dep. of Michael Lastine at 4, Ex. C to Riethof Aff. [Doc. No. 61-1].) Avera McKennan concedes that, under a theory of respondeat superior, it is responsible for the alleged acts and omissions of Dr. Lastine, should they be adjudicated as medical malpractice.  (Answer to Am. Compl. ¶ 9 [Doc. No. 31].)

### B.  The Medical Events

On January 27, 2009 at 6:42 a.m., Ms. Halsne was admitted to PCMC for a scheduled induction of labor because she was past her due date.  (Child Neurology Consultation of Garrett C. Burris, M.D., at 5, Ex. 3 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1]; Expert Report of Barry S. Schifrin, M.D., at 9, Ex. 1 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)  Although the nurse's note at 7:20 a.m. showed that Ms. Halsne was not having any contractions up to that point, the fetal monitoring record showed the start of very frequent contractions at 7:15 a.m.  (Schifrin Expert Report at 9, Ex. 1 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)  At 7:50 a.m., Dr. Lastine administered fifty micrograms of Cytotec, a medication for inducing labor.  (Id.; Lastine Dep. at 73, Ex. C to Riethof Aff. [Doc. No. 61-1].)  At 8:00 a.m., Ms. Halsne reported feeling contractions, and by 8:15 a.m., she was experiencing a contraction every one to-and-a-half minutes.  (Schifrin Expert Report at 9, Ex. 1 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)  At 9:30 a.m., Dr. Lastine was notified of her contraction frequency.  (Id.)

Ms. Halse was intermittently monitored and encouraged to ambulate.  (Id.)  At 10:00 a.m., Dr. Lastine was present, and he returned at 12:19 p.m. to administer a second fifty-

microgram dose of Cytotec.  (Id.; Lastine Dep. at 73, Ex. C to Riethoff Aff. [Doc. No. 61-1].)  At 12:32 p.m., stronger contractions occurred approximately one to two minutes apart, lasting forty-five to sixty seconds each.  (Schifrin Expert Report at 9, Ex. 1 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)  A deceleration in fetal heart rate was neither noted nor did it receive any response at this time.  (Id.)  At 1:02 p.m., Ms. Halsne reported low back pressure, stronger contractions, and strong discomfort.  (Id.)

At 1:35 p.m., Dr. Lastine was informed of the fetal heart rate deceleration from 12:32 p.m., and he did not give any new orders or changes.  (Id.)  At 2:08 p.m., he reviewed the fetal monitor tracing and ruptured the amniotic membranes, revealing a small amount of yellow fluid.  (Id. at 9-10; Lastine Dep. at 88, 95, Ex. C to Riethoff Aff. [Doc. No. 61-1].)  At 2:22 p.m., Dr. Lastine was informed of additional fetal heart rate deceleration and Ms. Halsne's "intense" contractions, for which Stadol was administered.  (Schifrin Expert Report at 10, Ex. 1 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)  At 2:47 p.m., Dr. Lastine was informed of further fetal heart rate deceleration, and he did not respond. (Id.)

At 3:47 p.m., the tocodynamometer revealed excessive uterine activity.  (Id.)  At 4:00 p.m., Ms. Halsne's cervix had dilated to three centimeters.  (Id.)  Dr. Lastine then told Ms. Halsne that he could not administer epidural anesthesia until dilation reached four centimeters.  (Id.)  Two minutes later, however, Dr. Lastine changed his mind and requested anesthesia to place the epidural "due to proximity of contractions."  (Id.; Lastine Dep. at 95, Ex. C to Riethoff Aff. [Doc. No. 61-1].)  Ms. Halsne received the epidural, which was activated at 4:30 p.m. with Ropivacaine and Fentanyl.  (Schifrin Expert Report at 10, Ex. 1

to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)

At 4:58 p.m., Ms. Halsne reported more low back pain.  (<u>Id.</u>)  Head compression was noted on the monitor with good variability, and the fetal heart tracing was "consistent." (<u>Id.</u>)  At 6:05 p.m., Ms. Halsne experienced low blood pressure.  She was turned on her left side, the IV rate was increased, and the oxygen was turned up to six liters.  (<u>Id.</u>)  The fetal heart rate showed deceleration.  (<u>Id.</u>)  Dr. Lastine was notified and arrived at 6:30 p.m.  (<u>Id.</u>) By this time, Ms. Halsne's cervix had dilated fully, and pushing was initiated.  (<u>Id.</u>; Lastine Dep. at 105-106, Ex. C to Riethoff Aff. [Doc. No. 61-1].)  Dr. Lastine remained at the bedside, and scalp stimulation was used repeatedly.  (Schifrin Expert Report at 10-11, Ex. 1 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)  At 7:26 p.m., the fetal head started to crown, and J.J.H. was delivered at 7:49 pm.  (<u>Id.</u> at 11.)

Upon delivery, J.J.H. required ongoing stimulation and two to three breaths with the Ambu bag.  (<u>Id.</u> at 15.)  In the nursery, J.J.H. had a weak cry and poor tone.  (<u>Id.</u>)  He was pale and developed apneic episodes that required oxygen and bagging.  (<u>Id.</u>)  J.J.H. was given Tylenol for a constant pain-like cry.  (<u>Id.</u>)  At twelve hours, J.J.H. was pale white with clear eyes and twitching eyelids.  (<u>Id.</u>)  There were indications of trauma to J.J.H.'s head, which was tender to the touch.  (<u>Id.</u>)  Fifteen minutes later, J.J.H. was "pale and flaccid with jerky movements of the extremities and twitching eyelids."  (<u>Id.</u>)  The seizures progressed, and at fourteen hours, J.J.H. was administered phenobarbital.  (<u>Id.</u>)  At fifteen hours, J.J.H. was transferred to McKennan NICU for apneic spells and seizures, where he stayed from January 28, 2009 until February 18, 2009.  (<u>Id.</u>; Burris Consultation at 5, Ex. 3 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)  He had no suck or latch when attempting

6

to breastfeed, but he passed the hearing test before the transfer.  (Schifrin Expert Report at 15, Ex. 1 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)

J.J.H. remained on phenobarbital until June 2010.  (Id.)  In June 2011, J.J.H. was admitted to the emergency room for seizures, at which time he was transferred to Children's Hospital.  (Id. at 15-16.)  On June 29, 2011, J.J.H was admitted to Sanford USD Medical Center due to a spell of unresponsiveness that lasted approximately one to one-and-a-half hours.  (Burris Consultation at 7, Ex. 3 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)  In 2012, J.J.H. had several seizures, the last of which occurred on June 13, 2012.  (Id. at 8.)  On February 13, 2013, J.J.H. had another seizure.  (Id.)  These seizures were left-sided and lasted between two to three minutes each.  (Id.)

J.J.H. has global developmental delay, acquired microcephaly, spastic quadriplegic cerebral palsy, and epilepsy.  (Id. at 10-11.)  Brain imaging studies of J.J.H. reflect partial prolonged hypoxic ischemic injury.  (Id. at 10.)

## C.     Dr. Lastine's Disciplinary History

In 2005, upon reviewing the cases of four patients for whom Dr. Lastine incorrectly prescribed medication, the Minnesota Board of Medical Practice restricted Dr. Lastine's ability to practice medicine for two years.[1]  (Supplemental Addendum Report of Barry S. Schifrin, M.D., Ex. F to Pl.'s Supplemental Brief on Defs.' Liability for Negligent

---

[1] Defendants do not dispute the substance of Dr. Lastine's disciplinary history, but they object to the timeliness of Plaintiff's submission of this information.  (Defs.' Reply Mem. in Supp. of Their Mot. for Partial Summ. J. at 3-4 [Doc. No. 75].)  The Court does not condone tardy submissions, but it will consider documents related to Dr. Lastine's disciplinary history because they raise a genuine issue of material fact for the negligent supervision claim.  Infra Part III(C).

Supervision and Medical Malpractice at 2 [Doc. No. 86].)  The Board required Dr. Lastine

to take coursework in areas pertaining to pharmacology and pain management; maintain a

log of controlled prescriptions; review relevant national standards; meet monthly with a

supervising physician approved by the Board to review Dr. Lastine's prescription log and a

sample of his charts, and to submit quarterly reports to the Board about his practice; have

his practice audited; and meet quarterly with a Board member or designee.  (Id. at 2-3.)

### D.    Defendants' Motion for Partial Summary Judgment

Defendants' present motion is one for partial summary judgment.  The issues

remaining for adjudication are: (1) whether the medical malpractice claim brought directly

against Defendants should be dismissed for lack of evidence to support a prima facie claim;

(2) whether the negligent supervision claims against Defendants based on the alleged

actions of their employees should be dismissed because there is no allegation that their

employees committed any intentional tort; (3) whether Avera Health should be dismissed;

and (4) whether J.J.H.'s future medical expense damages should be limited to projected

payments of premiums and deductibles under the Patient Protection and Affordable Care

Act.  (Id.; Def.'s Mot. for Partial Summ. J. [Doc. No. 58].)

This matter was heard on October 3, 2013.  (Court Mins. [Doc. No. 77].)  On

October 17, 2013, Plaintiff filed a Supplemental Brief on Defendants' Liability for

Negligent Supervision and Medical Malpractice [Doc. No. 88], to which Defendants

responded [Doc. No. 96] on October 30, 2013.

### III.    DISCUSSION

#### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.  All justifiable inferences are to be drawn in the non-movant's favor and the evidence of the non-movant is to be believed. Id. at 255.

#### B.  Medical Malpractice Claim Based on Direct Liability

Plaintiff premises her direct liability claim against Defendants on their allegedly deficient policies and procedures, namely:

> (1) Avera failed to set forth certain labor and delivery policies that would have conformed to the standard of care (e.g., require that a family practice doctor consult with an obstetrician before inducing labor), and (2) Avera did adopt certain policies and procedures that fell below the standard of care (e.g., specifying that physicians like Dr. Lastine could administer 50 micrograms of cytotec, which is twice the amount allowed by the standard of care).

(Pl.'s Supplemental Brief on Defs.' Liability for Negligent Supervision and Medical Malpractice at 10 [Doc. No. 88].)  To support this claim, Plaintiff submits Dr. Schifrin's

expert report, supplemental addendum report, and testimony.  (Id.; Mem. of Law in Opp'n

to Defs.' Mot. for Partial Summ. J. at 10-12 [Doc. No. 69]; Expert Report of Barry S.

Schifrin, M.D., Ex. 1 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1]; Supplemental

Addendum Report of Barry S. Schifrin, M.D., Ex. F to Pl.'s Supplemental Brief on Defs.'

Liability for Negligent Supervision and Medical Malpractice [Doc. No. 86]; Dep. of Barry

Schifrin at 176-79, Ex. G to Pl.'s Supplemental Brief on Defs.' Liability for Negligent

Supervision and Medical Malpractice [Doc. No. 86].)  Plaintiff also submits case law and

Minnesota's model jury instruction for hospital negligence.  (Pl.'s Supplemental Brief on

Defs.' Liability for Negligent Supervision and Medical Malpractice at 10-14 [Doc. No. 88].)

        Having reviewed the cases submitted by Plaintiff, the Court finds them

distinguishable from the instant facts.  For example, in Calcagno v. Emery, No. A11-1212,

2012 WL 1813389 (Minn. Ct. App. May 21, 2012), the plaintiff brought a medical

negligence action against a hospital that provided her care—not against any institution

acting in the capacity of Avera Health or Avera McKennan in this case.  Similarly, in

Roettger v. United Hosps. of St. Paul, Inc., 380 N.W.2d 856 (Minn. Ct. App. 1986), the

plaintiff and her husband brought a negligence action against a hospital in which she was

assaulted by a third-party trespasser while she was an inpatient.  Here, Plaintiff has not sued

PCMC, the hospital in which she delivered J.J.H.  No cited case stands for the proposition

that an entity acting in Defendants' capacity is liable on the basis of a deficient medical

policy.  Plaintiff's direct liability claim against Defendants based on their allegedly deficient

policies and procedures therefore cannot stand.

        Plaintiff's direct liability claim against Defendants also fails because she has not

established the prima facie elements.  To establish a prima facie claim of medical

malpractice, an expert affidavit must: (1) disclose specific details concerning the expert's

expected testimony, including the applicable standard of care; (2) identify the acts or

omissions that allegedly violated the standard of care; and (3) outline the chain of causation

between the violation of the standard of care and the plaintiff's damages.  Teffeteller v.

Univ. of Minnesota, 645 N.W.2d 420, 428 (Minn. 2002).[2]  Tellingly, Dr. Schifrin's expert

report focuses on the applicable standards of care for Dr. Lastine; Dr. Lastine's failure to

meet applicable standards of care; and the causal relationship between the care rendered by

Dr. Lastine and the injury, harm, or damages in this case.  (Schifrin Expert Report at 17-24,

Ex. 1 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-1].)  Dr. Schifrin, however, does

not opine that these Defendants have committed medical malpractice themselves through

the issuance of deficient policies, which policies caused the injuries in this case.[3]

With respect to Avera Health, there is no reference to this entity in Dr. Schifrin's

---

[2] Because this is a diversity case, the Court applies the substantive law of Minnesota, the forum state.  In re Levaquin Prods. Liab. Litig., 700 F.3d 1161, 1165 (8th Cir. 2012).

[3] The Court also reviewed the medical expert opinions of Marcus C. Hermansen, M.D., Garrett C. Burris, M.D., Wayne Blount, M.D., and Robert Zimmerman, M.D.—none of which establishes a prima facie claim of medical malpractice against Avera Health or Avera McKennan.  Dr. Hermansen opines on J.J.H.'s brain damage as a result of injuries at the end of labor and delivery.  (Report of Marcus C. Hermansen, M.D., Ex. 2 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-2].)  Dr. Burris opines on J.J.H.'s injuries, current neurological status, future needs, home care, and life expectancy.  (Child Neurology Consultation by Garrett C. Burris, M.D., Ex. 3 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-3].)  Dr. Blount opines on Dr. Lastine's failure to meet the applicable standards of care in caring for Ms. Halsne and J.J.H.  (Report of B. Wayne Blount, M.D., Ex. 4 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-4].)  Dr. Zimmerman summarizes J.J.H.'s injuries based on neuroimaging of J.J.H.'s brain from January 2009 to June 2011.  (Letter from Robert A. Zimmerman, Ex. 5 to Pl.'s Disclosure of Expert Witnesses [Doc. No. 34-5].)

expert report or supplemental addendum report.  As such, there is no prima facie claim of medical malpractice made against this Defendant.

As for Avera McKennan, Dr. Schifrin's expert report and supplemental addendum report do not identify the applicable standard of care with respect to policies relevant to inducing labor or the use of Cytotec.  In addition, these reports fail to show causation, and the record suggests why.  Although Avera McKennan can recommend policies and procedures for PCMC to implement, the final decision-making authority to implement them rests with PCMC.  (Dep. of Curt Hohman, at 10-11, Ex. B to Loidolt Aff. [Doc. No. 56-2].) Stated another way, Avera McKennan's policies hold no weight or authority at PCMC. (Dep. of Bradley Burris at 11, Ex. A to Riethof Aff. [Doc. No. 61-1].)  With the elements of standard of care and causation missing, Plaintiff has not established a prima facie claim of medical malpractice directly against Avera McKennan.

For these reasons, the Court grants summary judgment on this claim and dismisses the medical malpractice claim based on direct liability against Defendants.

### C.  Negligent Supervision Claim

Next, Defendants argue that Plaintiff's negligent supervision claim should be dismissed because Plaintiff does not allege that Dr. Lastine or any hospital administrator committed an intentional tort.  (Defs.' Mem. in Supp. of Their Mot. for Partial Summ. J. at 25-26 [Doc. No. 60].)  Plaintiff responds that a negligent supervision claim need not be predicated on an employee's intentional tort.  (Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. at 12 [Doc. No. 69].)

A negligent supervision claim is "premised on an employer's duty to control

employees and prevent them from intentionally *or negligently* inflicting personal injury."

Johnson v. Peterson, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007) (emphasis added).  The

purpose of this doctrine is to prevent the foreseeable misconduct of an employee from

causing harm to other employees or third persons.  Cook v. Greyhound Lines, Inc., 847 F.

Supp. 725, 732 (D. Minn. 1994).  Unlike negligent hiring and negligent retention, which are

based on direct liability, negligent supervision derives from the respondeat superior

doctrine.  Id.  A negligent supervision claim therefore requires a plaintiff to prove that the

employee who caused an injury did so within the scope of his employment.  Id.

The Court finds that there is a genuine issue of material fact regarding the negligent

supervision claim.  Plaintiff submits information about the disciplinary history of Dr.

Lastine for improperly prescribing medication; in fact, his license to practice medicine and

surgery in Minnesota was conditioned and restricted.  (Schifrin Supplemental Addendum

Report at 2-3, Ex. F to Pl.'s Supplemental Brief on Defs.' Liability for Negligent

Supervision and Medical Malpractice [Doc. No. 86].)  Plaintiff takes issue with the acts of

Dr. Lastine that occurred within the scope of his employment, including "the correct use and

dosage of Cytotec, a drug with potentially dangerous side effects administered in the course

of Ms. Halsne's labor."  (Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. at 12

[Doc. No. 69].)  Whether Avera McKennan knew or should have known about Dr. Lastine's

history of improperly prescribing medication and related discipline, and whether it failed to

prevent any foreseeable misconduct by Dr. Lastine from causing harm to Plaintiff, are

questions for a jury.  Accordingly, the Court denies Defendants' motion for summary

judgment on Plaintiff's negligent supervision claim.

### D.  Defendant Avera Health

Defendants argue that Avera Health should be dismissed because there are no direct claims against Avera Health, and Avera Health does not employ Dr. Lastine or Mr. Burris. (Defs.' Reply Mem. at 6 [Doc. No. 75].)  Plaintiff contends that there is a genuine issue of material fact about whether Avera Health and Avera McKennan should be regarded as the same entity, citing three legal theories: agency, alter ego, and "purpose and existence." (Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. at 14 [Doc. No. 69].) Defendants respond that none of these three legal theories applies in this case.  (Defs.' Reply Mem. at 7-14.)

As discussed previously, supra Part III(B), Plaintiff has not established a prima facie claim for medical malpractice against Avera Health based on direct liability.  And Avera Health cannot be vicariously liable for the acts of Dr. Lastine and Mr. Burris, because they are employees of Avera McKennan and not Avera Health.  (Lastine Dep. at 4, Ex. C to Riethof Aff. [Doc. No. 61-1 at 16]; Burris Dep. at 8, Ex. A to Riethof Aff. [Doc. No. 61-1 at 3].)  In addition, none of Plaintiff's three legal theories for holding Avera Health liable for the acts of Avera McKennan's employees applies, and the Court now examines them in turn.

#### 1.  Agency

Plaintiff seeks to hold Avera Health liable for the alleged acts of Avera McKennan employees under an agency theory.  An agency relationship can exist between corporations, such as when one corporation makes a contract on the other's account.  A.P.I., Inc. Asbestos Settlement Trust v. Home Ins. Co., 877 F. Supp. 2d 709, 722 (D. Minn. 2012).  Similarly, a

14

subsidiary may become an agent for the corporation that controls it.  Id.  A principal-agent

relationship results "from the manifestation of consent by one person to another that the

other shall act on his behalf and subject to his control, and consent by the other to so act."

Urban ex rel. Urban v. Am. Legion Post 184, 695 N.W.2d 153, 160 (Minn. Ct. App. 2005)

(citing Restatement (Second) of Agency § 1 (2004)).  The right to control, and not

necessarily the exercise of that right, gives rise to the vicarious liability of a principal for the

tortious act of his agent.  Id.  "The determinative right of control is not merely over *what* is

to be done, but primarily over *how* it is to be done."  Id. (citing Frankle v. Twedt, 47

N.W.2d 482, 487 (Minn. 1951)).

     In Urban, the plaintiffs sought to hold separately incorporated entities, American

Legion and American Legion Department of Minnesota, vicariously liable for the illegal

alcohol sale by Post 184 to a driver that collided with the plaintiffs' vehicle.  695 N.W.2d at

156-57.  The court concluded that although American Legion and American Legion

Department of Minnesota had some control over Post 184, the entities did not control the

physical undertakings of Post 184's daily activities.  Id. at 161.  The court therefore declined

to find an agency relationship between the two entities and Post 184.  Id.

     Here, Plaintiff claims that Avera McKennan acted as an agent for Avera Health in

providing obstetrical services to Plaintiff, because

> AH [Avera Health] exerted wide-ranging domination and control over the
> governance, values, policies, programs, and mission of AM [Avera
> McKennan].  AH was incorporated in great part for the purpose of operating a
> network of health care service providers and to provide health care services
> generally.  The majority of AM's corporate purposes significantly overlap
> with those of AH.

(Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. at 25 [Doc. No. 69].)  But even if Avera Health wields general control over Avera McKennan's "governance, values, policies, programs, and mission," Plaintiff has not shown that Avera Health controls the physical undertakings of Avera McKennan's daily activities, such as how Avera McKennan employees provide obstetrical services to patients at PCMC.  Indeed, Plaintiff cannot make such a showing.  Any policy or procedure regarding labor and delivery originates from and is finalized by Pipestone County Medical Center, and Avera McKennan cannot require PCMC to follow any particular policies or procedures.  (Burris Dep. at 9-12, Ex. A to Riethof Aff. [Doc. No. 61-1].)  Similar to the entities in Urban, which lacked control over the physical undertakings of Post 184's daily activities, Avera Health does not control the manner in which Avera McKennan provides obstetrical services to patients at PCMC.  Accordingly, Plaintiff's agency theory cannot preclude summary judgment on this issue.

## 2.  Alter Ego

Plaintiff also argues that genuine issues of material fact exist regarding Avera Health's liability for the acts of Avera McKennan's employees under the doctrine of alter ego.  (Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. at 21-24 [Doc. No. 69].)  Defendants respond that Plaintiff did not plead an alter ego claim, and regardless, there is no evidence to support applying the alter ego doctrine here.  (Defs.' Reply Mem. at 10-13 [Doc. No. 75].)

Generally, a parent corporation cannot be held liable for the wrongdoing of a subsidiary without a showing of improper conduct, fraud, or bad faith.  Urban, 695 N.W.2d at 161.  To disregard the corporate structure and hold one corporation liable for another's

16

wrongdoing—that is, to pierce the corporate veil—Minnesota courts use a two-part test established in Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc., 283 N.W.2d 509 (Minn. 1979).  Id.  The first part of the test requires that "a number of" the following factors must exist: (1) insufficient capitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of debtor corporation, (5) siphoning of funds, (6) nonfunctioning of officers and directors, (7) absence of corporate records, or (8) existence of corporation as merely façade for individual dealings.  Id.  The second, and more important, part of the test requires a finding of injustice or fundamental unfairness, usually meaning that the corporation "has been operated as a constructive fraud or in an unjust manner."  Miller & Schroeder, Inc. v. Gearman, 413 N.W.2d 194, 196 (Minn. Ct. App. 1987).  Where the "formalities of corporate existence are disregarded by one seeking to use it," the corporate existence cannot be allowed to shield the individual from liability. Urban, 695 N.W.2d at 162.  A genuine issue of material fact concerning both parts of the test can preclude summary judgment.

Significantly, Plaintiff has not alleged that Avera Health operated Avera McKennan as a constructive fraud or in an unjust manner.  As such, there is no genuine issue of material fact concerning the second, and more important, part of the test under Victoria.

Likewise, there is no genuine issue of material fact concerning the first part of the test.  Plaintiff claims that Avera McKennan was insufficiently capitalized because it cannot issue capital stock, its sole member is Avera Health, and its finances are substantially intertwined with and dependent on funds and administrative mechanisms managed by Avera Health.  (Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. at 22 [Doc. No.

69].)  Plaintiff also claims that Avera McKennan failed to observe traditional corporate formalities.  (Id. at 22-23.)  Plaintiff further claims that Avera Health never paid dividends and has the authority to siphon funds from Avera McKennan.  (Id. at 23.)  But such claims, without any identified support from the record, are insufficient to defeat summary judgment.

Because Plaintiff fails to establish a genuine issue of material fact concerning both parts of the test under Victoria, the Court declines to hold Avera Health liable based on an alter ego theory.

### 3.  "Purpose and Existence"

Plaintiff argues that Avera Health should be liable for the negligent acts of Avera McKennan employees under a "purpose and existence theory."  (Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. at 20 [Doc. No. 69].)  Minnesota courts, however, have not used such a theory to hold a parent corporation liable for the torts of its subsidiary's employees.  Accordingly, the Court declines to hold Avera Health liable for the acts of Avera McKennan employees on this ground.

Because Plaintiff has not established any claims against Avera Health based on direct liability or vicarious liability under any other legal theory, such as agency, alter ego, and "purpose and existence," the Court grants summary judgment on this issue and dismisses Avera Health from this litigation.

### E.  J.J.H.'s Future Medical Expense Damages

Finally, at issue is whether J.J.H.'s future medical expense damages should be limited to projected payments of premiums and deductibles under the Patient Protection and Affordable Care Act ("the Affordable Care Act"), Pub. L. 111-148, 124 Stat. 119 (2010).

Defendants argue that such damages should be limited because Plaintiff is not required to pay the full price of projected medical services, and to decide otherwise would grant Plaintiff a windfall.  (Defs.' Mem. in Supp. of Their Mot. for Partial Summ. J. at 26-28 [Doc. No. 60].)  Plaintiff contends that J.J.H.'s damages should not be limited in light of the Minnesota collateral source statute, Minn. Stat. § 548.251, and general principles of tort recovery.  (Mem. of Law in Opp'n to Defs.' Mot. for Partial Summ. J. at 25-32 [Doc. No. 69].)  In the alternative, Plaintiff argues that: (1) the Affordable Care Act does not change Plaintiff's right to recover medical expenses; (2) there is uncertainty about the implementation and survival of the Affordable Care Act; (3) Defendants' experts do not address the Affordable Care Act in their reports; and (4) Defendants' allegations ignore important language of the Pre-Existing Condition Insurance Program.  (Id.)

Minnesota's collateral source doctrine is long established in Minnesota courts. Under the doctrine, a plaintiff can recover full damages from a tortfeasor, regardless of whether the plaintiff can recover some or all of his damages from a collateral source of payment, such as insurance.  See VanLandschoot v. Walsh, 660 N.W.2d 152, 155 (Minn. Ct. App. 2003) ("in general . . . compensation received from a third party will not diminish recovery against a wrongdoer.").  The public policy behind this doctrine is that a tortfeasor should not benefit from an injured party's foresight to arrange for insurance.  In 1986, the Minnesota legislature defined "collateral sources" and provided for certain exceptions under the law.  MINN. STAT. § 548.251.[4]

---

[4] Minn. Stat. § 548.251, subd. 1, provides:

In <u>Renswick v. Wenzel</u>, 819 N.W.2d 198 (Minn. Ct. App. 2012), the Minnesota Court of Appeals addressed whether the collateral source doctrine allowed a trial court to reduce an award based on the availability of Medicare funds.  819 N.W.2d at 210. Recognizing that Medicare falls within the Social Security Act, and that the language of the collateral source statute excludes payments made under that Act from the general rule preventing double recovery, the Court nonetheless concluded that Medicare benefits did not provide a basis to reduce the plaintiff's damages award.  <u>Id.</u> at 210-11.

Recently, the Hennepin County District Court addressed whether recovery of future medical expenses based on the Patient Protection and Affordable Care Act should be foreclosed.  <u>Vasquez-Sierra v. Hennepin Faculty Assocs.</u>, No. 27-cv-12-1611, 2012 WL

---

For purposes of this section, "collateral sources" means payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict, by or pursuant to:

(1) a federal, state, or local income disability or Workers' Compensation Act; or other public program providing medical expenses, disability payments, or similar benefits;

(2) health, accident and sickness, or automobile accident insurance or liability insurance that provides health benefits or income disability coverage; except life insurance benefits available to the plaintiff, whether purchased by the plaintiff or provided by others, payments made pursuant to the United States Social Security Act, or pension payments;

(3) a contract or agreement of a group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical, dental or other health care services; or

(4) a contractual or voluntary wage continuation plan provided by employers or any other system intended to provide wages during a period of disability, except benefits received from a private disability insurance policy where the premiums were wholly paid for by the plaintiff.

20

7150829 (Minn. Dist. Ct. Dec. 14, 2012).  The court stated that it

> . . . is not inclined to speculate that the recent and controversial federal health care legislation upends Minnesota's collateral source doctrine.  Until the Minnesota legislature passes new legislation regarding collateral sources in light of the Affordable Care Act, this court will not re-write long-standing law regarding collateral sources.

Id.  The court permitted the question of damages to proceed to the jury.  Id.

Persuaded by the reasoning in Renswick and Vasquez-Sierra, the Court finds that any benefits received through the Affordable Care Act do not provide a basis for reducing the potential award to Plaintiff.  Thus, the Court denies summary judgment on this issue.

## IV.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Partial Summary Judgment [Doc. No. 58] is **GRANTED IN PART** and **DENIED IN PART**.


Dated:        March 21, 2014                  s/ Susan Richard Nelson
                                              SUSAN RICHARD NELSON
                                              United States District Court Judge